NOTICE:  All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports.  If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-13797

COURTNEY GILARDI & others[1] vs.  BOARD OF HEALTH OF PITTSFIELD.


Berkshire.      December 3, 2025. – July 23, 2026.

Present:  Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, Dewar, & Wolohojian, JJ.


Federal Preemption.  Constitutional Law, Federal preemption.  Municipal Corporations, Board of health.  Cellular Telephone.  Telecommunications Act.  Telecommunications.  Practice, Civil, Judgment on the pleadings, Dismissal.



Civil action commenced in the Superior Court Department on July 28, 2022.

The case was heard by Francis E. Flannery, J., on a motion for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.


W. Scott McCollough, of Texas (Paul Revere, III, also present) for the plaintiffs.
Buffy D. Lord (Gregory P. Howard also present) for the defendant.
The following submitted briefs for amici curiae:
Michael Pill for Massachusetts for Safe Technology.

------

[1] Charlie Herzig, Judy Herzig, Mark Markham, Angelika Markham, and Elaine Ireland.

Cheryl Sbarra for Massachusetts Association of Health Boards, Inc.

David R. Venderbush, of New York, & Robert C. Ross for Pittsfield Cellular Telephone Company.

Jessica L. Wagner, of the District of Columbia, & Douglas S. Brooks for Chamber of Commerce of the United States of America.

Joseph M. Sandri, Jr., & Gabriel Burke, of the District of Columbia, & Jennifer O'Shea for Environmental Health Trust.

Terrence J. Dee, of Illinois, & Seth C. Farber for CTIA -- The Wireless Association and Wireless Infrastructure Association.

Neil J. Berman for Physicians for Safe Technology.

BUDD, C.J.  A local health board issued an order directing a cell tower operator to cease operations based on the board's concerns about adverse health effects from the tower's radio waves.  The cell tower operator filed suit in Federal court, alleging that Federal law preempted the board's action, and the board subsequently rescinded the order.  Six residents brought an action seeking review of the board's decision to rescind its order, but the motion judge dismissed the suit, concluding that the order conflicted with Federal law and was therefore preempted.  For the reasons that follow, we affirm.[2]

---

[2] We acknowledge the amicus briefs submitted by Massachusetts for Safe Technology; the Environmental Health Trust; and Physicians for Safe Technology in support of the plaintiffs, and those submitted by the Massachusetts Association of Health Boards, Inc.; the Chamber of Commerce of the United States of America; CTIA -- The Wireless Association and Wireless Infrastructure Association; and Pittsfield Cellular Telephone Company in support of the defendant.

Background.  Pittsfield Cellular Telephone Company, doing business as Verizon Wireless (Verizon), began operating a wireless cell phone tower in Pittsfield (city) in August 2020. Shortly after the tower started transmitting, the city began to receive complaints from residents living near the tower about symptoms they were experiencing, including headaches, tinnitus, and nausea.  The residents contended that the symptoms were the result of continuous exposure to radiofrequency (RF) emissions from the cell tower.

The city's board of health (board) undertook an investigation at the request of the city council.  In April 2022, the board issued an emergency order summarizing the investigation and concluding that the symptoms experienced by the residents were consistent with radiation sickness caused by the operation of the cell tower.  As a result, the board deemed the cell tower a public nuisance and gave Verizon seven days to request a hearing to show cause as to why the board should not shut down the tower "to protect its citizens from injury and harm."  If Verizon failed to respond, the order would convert into a "notice of discontinuance," requiring Verizon to "abate and eliminate all activities and operations leading to the . . . nuisance" resulting from the tower's RF emissions.

Verizon responded by filing a lawsuit against the board in Federal court, seeking a judgment declaring that the order was

invalid because it was preempted by the Federal Telecommunications Act of 1996 (TCA). The board thereafter voted to rescind the order, and Verizon voluntarily dismissed its lawsuit.[3]

Six of the residents who claimed to have been harmed by the cell tower RF emissions subsequently filed suit against the board in the Superior Court, seeking review of the board's decision to rescind its order.[4] The plaintiffs argued that the board's action was arbitrary and capricious and constituted a breach of its duty under G. L. c. 111, § 122, to eliminate nuisances injurious to public health.

The board moved to dismiss the suit on the basis that its order was preempted by Federal law. Treating the motion as one for judgment on the pleadings, the motion judge agreed, and the suit was dismissed. The plaintiffs appealed from the ruling, and we transferred the case to this court sua sponte.

---

[3] Concern about litigation risk was the main factor in the board's decision to rescind the order. However, as the board was evaluating its options after Verizon filed suit, some board members also expressed doubts about the evidence supporting the order, noting, for example, the lack of medical records. And despite the order's conclusion that the residents' symptoms were "directly caused" by emissions from the Verizon cell tower, the chair of the board stated in one meeting that she believed the people in the community were "being harmed somehow" but "[di]dn't know what[ was] going on."

[4] The complaint also asserted claims against the mayor of Pittsfield, the city solicitor, Verizon, and Farley White South Street, LLC. Those claims were dismissed.

Discussion.  The parties have stipulated that the question of preemption is dispositive of the case.  Indeed, if preemption applies, then the board lacked authority to issue the order in the first place, and the plaintiffs would have no basis to challenge the board's decision to rescind it.

1.  Principles of Federal preemption.  Under the supremacy clause of the United States Constitution, State laws that "interfere with" or "are contrary to" Federal law are invalid. Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 712-713 (1985), quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 211 (1824).

> "State law is preempted by Federal law when (1) the preemptive intent is stated explicitly in the Federal law's language or implicitly contained in its structure and purpose (express preemption), (2) the Federal law so thoroughly occupies a legislative field such that it is reasonable to infer that Congress left no room for the State to supplement it (field preemption), or (3) the State law actually conflicts with the Federal law (conflict preemption)" (footnote omitted).

Marsh v. Massachusetts Coastal R.R., 492 Mass. 641, 648 (2023), cert. denied, 144 S. Ct. 2519 (2024).  As relevant here, a State law conflicts with Federal law if "compliance with both . . . is impossible" (impossibility preemption), or "when the [S]tate law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" (obstacle preemption). Id. at 662, quoting Michigan Canners & Freezers Ass'n v.

Agricultural Mktg. & Bargaining Bd., 467 U.S. 461, 469 (1984).[5]
There is a presumption against preemption in areas traditionally
within the States' police powers.  See Ajemian v. Yahoo!, Inc.,
478 Mass. 169, 178 (2017), cert. denied sub nom. Oath Holdings,
Inc. v. Ajemian, 584 U.S. 910 (2018) ("we presume that Congress
did not intend to intrude upon traditional areas of State
regulation or State common law unless it demonstrates a clear
intent to do so").

    2.   Overview of the Federal Telecommunications Act of 1996.
The TCA amended the Communications Act of 1934, which
established the Federal Communications Commission (FCC) "as the
centralized authority" for overseeing the telecommunications
industry.  Cohen v. Apple Inc., 497 F. Supp. 3d 769, 773 (N.D.
Cal. 2020).  See 47 U.S.C. § 151.  Prior to the TCA, local
telephone networks were governed as natural monopolies, see
Roberts v. Southwestern Bell Mobile Sys., Inc. 429 Mass. 478,
479 (1999), and Federal law imposed structural separations
between providers of different services, see Meyerson, Ideas of
the Marketplace:  A Guide to the 1996 Telecommunications Act, 49
Fed. Comm. L.J. 251, 272 & n.129 (1997).

    In response to technological developments, Congress passed

---

[5] The board does not argue -- and we do not conclude -- that
it would be impossible to comply with both the order and Federal
law.  Obstacle preemption is therefore the only type of conflict
preemption at issue here.

the TCA to shift the regulatory regime away from the natural monopoly model.  The principal goal of the TCA was to promote competition and "encourage the rapid deployment of new telecommunications technologies" in order to secure lower prices and higher quality services for all consumers (citation omitted).  Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005).  Telecommunications Act of 1996, Preamble, Pub. L. No. 104-104, 110 Stat. 56 (1996).  To that end, the TCA opened local telephone markets to competition and allowed providers using different technologies to compete in overlapping service markets.  See Roberts, 429 Mass. at 479.  It also prohibited local regulations that would create barriers to entry for "any entit[ies]" providing "any . . . telecommunications service." 47 U.S.C. § 253(a).  In particular, as most relevant here, the TCA sought to remove "the impediments imposed by local governments upon the installation of facilities for wireless communications."  Abrams, supra.  See 47 U.S.C. § 332(c)(7)(B)(i)-(v).

3.  Analysis.  We review questions of preemption de novo. See West St. Assocs. LLC v. Planning Bd. of Mansfield, 488 Mass. 319, 322 (2021).  "The purpose of Congress is the ultimate touchstone of pre-emption analysis" (quotation and citation omitted).  Cipollone v. Liggett Group, Inc., 505 U.S. 504, 516 (1992).  Our discussion is therefore guided by the purpose of

the TCA, i.e., to create a "pro-competitive . . . national policy framework" that promotes efficient services, including efficient wireless networks nationwide. H.R. Rep. No. 104-458, 104th Cong., 2d Sess., at 1 (1996). Paramount to that goal is a uniform Federal regulatory regime for wireless services.[6]

As radio waves are not divided by State lines and wireless networks are national in scope, having "uniform technical standards" nationwide is "[a]n essential element of an efficient wireless network."[7] Farina v. Nokia Inc., 625 F.3d 97, 124 (3d Cir. 2010), cert. denied, 565 U.S. 928 (2011), citing Federal Radio Comm'n v. Nelson Bros. Bond & Mtge. Co., 289 U.S. 266, 279 (1933). The need for uniformity extends to RF emissions

---

[6] Centralized decision-making regarding wireless network standards has been a feature of the nation's telecommunications laws since 1934. The 1934 act first endowed the FCC with "comprehensive powers to promote and realize the vast potentialities of radio." National Broadcasting Co. v. United States, 319 U.S. 190, 217 (1943). The FCC would have "exclusive" control "over technical matters," Head v. New Mexico Bd. of Examiners in Optometry, 374 U.S. 424, 430 & n.6 (1963), citing 47 U.S.C. § 301, including the power to regulate "the kind of apparatus" used for wireless radio communications and "the emissions" that such apparatus may produce, 47 U.S.C. § 303(e).

[7] Accordingly, the FCC has taken the position -- in both rulemaking and adjudication -- that its technical standards and operational rules are to be "appl[ied] nation-wide . . . without regard to state boundaries or varying local jurisdictions." Matter of an Inquiry Relative to the Future Use of the Frequency Band 806-960 MHz, 46 F.C.C.2d 752, 766 (1974). See Matter of Petition of the Conn. Dep't Pub. Util. Control, 10 F.C.C.R. 7025, 7033-7034 par. 14 (1995).

standards because the strength of cell phone signals depends on the availability of RF coverage in each geographic area, which in turn depends on the intensity of RF emission levels. Farina, supra at 104. Congress explicitly recognized that "[a] high quality national wireless telecommunications network cannot exist if each of its component[s] must meet different RF standards in each community," and that uniform RF requirements would "provide consumers with lower costs as well as with a greater range and options." H.R. Rep. No. 104-204, 104th Cong., 1st Sess., pt. 1, at 94-95 (1995). See Farina, supra at 126. Accordingly, the TCA delegated the authority to set a national RF emission standard to the FCC, and the agency in 1996 established the standard currently in place. See infra.

Enforcement of the board's order would have frustrated the TCA's objective of creating uniform wireless networks nationwide. First, the order would effectively subject the cell tower's operations to restrictions based on the board's concerns about RF emissions regardless of the tower's compliance with the Federal RF standard, thereby interfering with the regulatory uniformity Congress intended. Allowing State and local governments to impose different requirements would "impair the efficiency of the wireless market," Farina, 625 F.3d at 125-126, and frustrate Congress's intent to "ensure that adequate service

is accessible throughout the country at a low cost,"[8] id. at 124. See Robbins v. New Cingular Wireless PCS, LLC, 854 F.3d 315, 320 (6th Cir. 2017) (tort claims against network operator preempted by TCA because lawsuits alleging harms from RF emissions "would tie up companies whenever they tried to build cell towers," resulting in "less public access to affordable cell-phone services").[9]

Second, the order would have interfered with the TCA's objective of having a Federal agency -- the FCC -- regulate RF

---

[8] The plaintiffs argue there is no clear evidence that the board's action interferes with the Federal objectives, and point to Arthur D. Little, Inc. v. Commissioner of Health & Hosps. of Cambridge, 395 Mass. 535, 547-548 (1985) (Little), where this court upheld a local health regulation restricting the testing of chemical weapons within city limits. Little stands on very different footing. In that case, the court rejected the plaintiff's argument that the regulation was "preempted by Federal legislation authorizing and regulating chemical warfare research," concluding that there was no indication that the Federal statutes cited by the plaintiff evinced a "Federal scheme whatsoever which either promote[d] or encourage[d] the research at issue." Id. at 548-550. In contrast, Congress in passing the TCA explicitly meant to encourage the development of a national telecommunications network and intended a uniform, federally controlled regulatory system for RF emissions.

[9] Indeed, 47 U.S.C. § 332(c)(7)(B)(iv) expressly prohibits local governments from regulating "the placement, construction, and modification" of wireless facilities "on the basis of the environmental effects of [RF] emissions" to the extent that such facilities comply with Federal standards. Regardless of whether the board's order would have constituted a violation of the subsection, this provision strongly suggests that Congress did not intend local jurisdictions to subject wireless operators to additional restrictions on RF emissions based on concerns about health effects to local communities.

emissions.  The TCA expressly delegated the task of setting RF emission standards to the FCC.  See Telecommunications Act of 1996, Pub. L. No. 104-104, § 704(b), 110 Stat. 56, 152 (1996) (instructing FCC to prescribe rules "regarding the environmental effects of [RF] emissions" within 180 days of TCA's enactment). Through the act, Congress tasked the FCC with weighing "the need to protect the public and workers from exposure to potentially harmful RF electromagnetic fields and the requirement that industry be allowed to provide telecommunications services to the public in the most efficient and practical manner possible." Matter of Procedures for Reviewing Requests for Relief from State & Local Regulations, 12 F.C.C.R. 13494, 13496 par. 2 (1997).  See 47 U.S.C. § 332(a) (in managing wireless services, FCC "shall consider" factors including "safety of life and property," "efficiency of spectrum use," "regulatory burden upon spectrum users," and effects on competition).

In so doing, the FCC sought input from other Federal agencies and interested parties, including the Environmental Protection Agency, the Food and Drug Administration (FDA), the Occupational Safety and Health Administration (OSHA), and the National Institute for Occupational Safety and Health, before

revising RF standards in 1996.[10]  Matter of Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation, 11 F.C.C.R. 15123, 15124 par. 2, 15131 pars. 19, 20 (1996).  After considering comments raising a wide range of considerations, the FCC decided to "place special emphasis on the recommendations and comments of Federal health and safety agencies because of their expertise and their responsibilities with regard to health and safety matters."  Id. at 15135 par. 28.  The FCC concluded that the revised standards would "protect workers and the general public from potentially harmful RF emissions," id., a determination it reaffirmed in 2019 after evaluating new information on RF emissions that emerged in the intervening years, see Matter of Proposed Changes in the Comm'n's Rules Regarding Human Exposure to Radiofrequency Electromagnetic Fields Reassessment of Fed. Communications Comm'n Radiofrequency Exposure Limits & Policies Targeted Changes to the Comm'n's Rules Regarding Human Exposure to Radiofrequency Electromagnetic

---

[10] Even before the enactment of the TCA, the FCC had exercised its authority to regulate RF emissions at the national level.  In 1985, the FCC adopted guidelines for human exposure to RF emissions pursuant to the National Environmental Policy Act.  Farina, 625 F.3d at 106.

Fields, 34 F.C.C.R. 11687, 11688-11689 par. 2 (2019) (Proposed Changes).[11]

The board's order would have contravened Congress's "deliberate choice" to have the FCC make centralized determinations about the appropriate RF limits on a national scale. Arizona v. United States, 567 U.S. 387, 405 (2012). By attempting to restrict Verizon's operations based on the board's judgment that RF emissions within Federal limits could be unsafe, the board sought to "second-guess the balance reached by the FCC in setting RF emission standards." Bennett v. T-Mobile USA, Inc., 597 F. Supp. 2d 1050, 1053 (C.D. Cal. 2008). Because "Congress authorized the federal government -- and not local governments -- to strike the proper balance between protecting

---

[11] In its reevaluation, the FCC again balanced evidence of RF emissions' public health risks and the need for functioning, efficient wireless networks. For example, it rejected significantly lower limits proposed by commenters based on the lack of evidence of those limits' health benefits and the observation that "[n]o device could reliably transmit any usable level of energy by today's technological standards while meeting those limits." Proposed Changes, 34 F.C.C.R. at 11694 par. 12. If the plaintiffs do not think the current Federal standard is sufficiently protective, they can file a challenge in Federal court. In fact, citizens have challenged the FCC's 2019 order as arbitrary and capricious in Environmental Health Trust v. Federal Communications Comm'n, 9 F.4th 893, 900, 902 (D.C. Cir. 2021). In that case, the United States Court of Appeals for the District of Columbia Circuit held that the FCC failed to provide a reasoned explanation for its determination that the 1996 guidelines adequately protect against RF's harms unrelated to cancer. The court remanded to the FCC for further explanation, but it did not invalidate the underlying standards. Id. at 903, 914.

the public from RF-emissions exposure and promoting a robust telecommunications infrastructure," Robbins, 854 F.3d at 319-320, the order would stand as an obstacle to the accomplishment of the purpose of the TCA. See Farina, 625 F.3d at 123; CTIA -- the Wireless Ass'n v. Berkeley, 487 F. Supp. 3d 821, 833-834 (N.D. Cal. 2020) (CTIA) (TCA preempted local ordinance mandating warning about RF emissions because it would upset FCC's balancing). Cf. Buckman Co. v. Plaintiffs' Legal Comm., 531 U.S. 341, 348 (2001) (FDA labeling requirements preempted State law fraud claims because FDA uses "this authority . . . to achieve a somewhat delicate balance of statutory objectives" that "can be skewed by allowing fraud-on-the-FDA claims under state tort law").

We are unpersuaded by the plaintiffs' various arguments against the applicability of preemption. As a preliminary matter, characterizing the order as an "adjudication" rather than a regulation of RF emissions cannot shield it from preemption analysis. The order compelled Verizon to either attend a show cause hearing or "eliminate all activities and operations" at the cell tower because the board concluded that the RF emissions from the tower constituted a health threat. Thus, even though the order did not explicitly propose a different emissions standard, it improperly sought to impose additional restrictions on the tower's operations based on

concerns about RF emissions within the Federal limits.[12]  Cf.

Farina, 625 F.3d at 122 (tort claims against FCC-compliant cell

phones had "inescapable effect" of challenging those standards

regardless of intent).

The plaintiffs' contention that the board has the power

(and duty) to enforce generally applicable State health and

safety laws, regardless of any preemption analysis, similarly

betrays a fundamental misunderstanding of preemption.  Federal

supremacy means that any State law "that conflicts with federal

law is without effect" (quotation and citation omitted).

Cipollone, 505 U.S. at 516.  To be sure, the presumption against

preemption is heaviest in matters such as public health and

welfare over which States have historically exercised control.

See Arthur D. Little, Inc. v. Commissioner of Health & Hosps. of

Cambridge, 395 Mass. 535, 546 (1985) (Little).  Nevertheless,

where State law stands as a clear obstacle towards achievement

---

[12] The plaintiffs also argue that the order should not be
understood as requiring Verizon to cease operations because, had
the company participated in the show cause hearing as requested,
it might have been able to work out some solutions satisfactory
to the board short of ceasing or even altering its service.
However, neither the board's motivation in issuing the order,
nor speculation about how a potential negotiation might play
out, can overcome the order's plain terms requiring Verizon to
shut down the cell tower past the seven-day deadline.  Moreover,
the FCC has set the standard for RF emissions; characterizing
the order as an invitation to negotiate a different standard for
Verizon within the city limits does not evade the conclusion
that the order stood as an obstacle to a uniform Federal
standard.

of a clear Federal goal, as we conclude the order does, the local law must yield to the Federal law under our constitutional system. See Chadwick v. Board of Registration in Dentistry, 461 Mass. 77, 89 (2011) ("The board cannot refashion this underlying action as a State law 'standard of conduct' to avoid" conflict preemption).

The plaintiffs' various other arguments against preemption also are unavailing. The plaintiffs argue that the order would not undermine the TCA's objective of uniformity given the existing variations in operations of wireless networks. That argument misconstrues the relevant congressional policy. Congress intended uniformity in regulations and standards, not uniformity in actual emissions or network operations. Congress granted the FCC the exclusive authority to set RF emission standards so that there would be one standard within which operators could freely optimize their networks across jurisdictional boundaries.[13] For similar reasons, whether

---

[13] The plaintiffs also argue that, because the TCA requires wireless network operators to "use the minimum amount of power necessary to carry out the communication desired," 47 U.S.C. § 324, the order did not run afoul of the act's purpose by asking Verizon to mitigate its emissions. We disagree. The order did not ask Verizon to comply with the Federal requirement of using the minimum level of power necessary. To the contrary, it sought to restrict Verizon's operations in order to address the perceived public health risks of RF emissions, on which point Congress intended local governments to have no say. Cf. Chadwick, 461 Mass. at 89 (State board preempted from

Verizon could comply with the order without compromising its service is of little relevance. Even if Verizon could modify its operations to the board's satisfaction, any additional RF-related requirements mandated by the board would still conflict with the TCA's goals of promoting efficient national wireless networks through regulatory uniformity and centralized decision-making.[14]

The plaintiffs also suggest that the lack of Federal remedies directly addressing their alleged injuries changes the

_____

interpreting standards by Federal regulation but not prohibited "from mandating compliance with OSHA standards in a dental practice and subsequently sanctioning a dentist as a result of violations identified by OSHA").

[14] The United States Court of Appeals for the Fourth Circuit in Pinney v. Nokia, Inc., 402 F.3d 430, 459 (4th Cir.), cert. denied sub nom. Nokia, Inc. v. Naquin, 546 U.S. 998 (2005), allowed class actions against cell phone distributors and manufacturers based on RF-related claims. But Pinney is an outlier among a large number of Federal and State cases that found preemption of similar claims. See, e.g., Robbins, 854 F.3d at 319-320; Farina, 625 F.3d at 123-125; Cohen, 497 F. Supp. 3d at 773; CTIA, 487 F. Supp. 3d at 833-834; Bennett, 597 F. Supp. 2d at 1053; Goforth v. Smith, 338 Ark. 65, 73-75 (1999) (nuisance claims based on RF emissions preempted); Stanley v. Amalithone Realty, Inc., 94 A.D.3d 140, 146 (N.Y. 2012). More importantly, Pinney was premised on the understanding that Congress did not have "an implicit goal of making preemptive the RF radiation standards for . . . wireless telephones," whereas the opinion explicitly acknowledged that Congress "allowed for preemptive national RF radiation standards" as to personal wireless service facilities such as cell towers. Pinney, supra at 458. In any case, the plaintiffs here have not brought tort claims and instead seek to subject Verizon's operations to additional restrictions based on concerns about RF emissions. For the reasons we have stated, such relief is preempted by the TCA.

preemption analysis.  However, the cases they cite for this proposition are distinguishable in that they concerned tort claims.  See Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251 (1984); United Constr. Workers v. Laburnum Constr. Corp., 347 U.S. 656, 663-664 (1954).  There are no tort claims at issue in this case.  The order sought not to compensate the plaintiffs for their personal injuries allegedly caused by Verizon's conduct, but to restrict RF emissions from the cell tower based on the board's assessment of health risks.[15]

Judgment affirmed.

---

[15] Contrary to the plaintiffs' suggestion, the two general savings clauses in the TCA do not preclude a conclusion that the order is preempted.  See 47 U.S.C. § 414 ("Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provision of this chapter are in addition to such remedies"); Pub. L. No. 104-104, Title VI, § 601(c)(1), 110 Stat. 143 (1996) ("This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments").  A savings clause "does not bar the ordinary working of conflict pre-emption principles."  Geier v. American Honda Motor Co., 529 U.S. 861, 869 (2000).  Although savings clauses usually foreclose a finding of field preemption, In re NOS Communications, MDL No. 1357, 495 F.3d 1052, 1058 (9th Cir. 2007), a court should not "give broad effect to [them] where doing so would upset the careful regulatory scheme established by federal law" (citation omitted), Geier, supra at 870 (Federal vehicle safety standard preempted State tort claims despite savings clause).  See Farina, 625 F.3d at 132 & n.30 (47 U.S.C. § 414 "applies generally, and as such, does not provide strong evidence of the congressional objectives bound up with the regulation of RF emissions").